# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

DENVER DIVISION

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

FEB 27 2023

JEFFREY P. COLWELL
CLERK

DANIEL P. RICHARDS )
a resident of the State of Washington )
3 Olive Drive, Apartment 2 )
Cathlamet, Washington 98612 )
 )  Civil Action No.
Plaintiff )
 )  1:22-cv-01640-CNS-MDB
v. )
 )
LOCKHEED MARTIN CORPORATION )
D/B/A LOCKHEED MARTIN SPACE, )
a corporation headquartered in and organized )
under the laws of the State of Maryland )
6801 Rockledge Drive )
Bethesda, Maryland 20817 )
SERVE:   Corporation Service Company )
           Registered Agent )
           1900 W. Littleton Boulevard )
           Littleton, Colorado 80120 )
 )
Defendant )
 )

## AMENDED COMPLAINT

The Plaintiff, DANIEL RICHARDS, sues the Defendant, LOCKHEED MARTIN CORPORATION D/B/A LOCKHEED MARTIN SPACE, and hereby states and alleges that this action is brought to remedy discrimination on the basis of physical disability and/or discriminatory disparate impact, and to remedy retaliation and intimidation against military veterans, and for corresponding laws and rights under Colorado State law, brought under the pendent jurisdiction of the Court, and for Colorado State law claims arising from a common nucleus of operative facts brought under the pendent jurisdiction of the court; for reinstatement and back wages; injunctive relief; declaratory relief; damages and other appropriate legal and equitable relief as sought pursuant to 42 U.S.C. § 2000e and the Americans with Disability Act,

### I. JURISDICTION AND VENUE

1) This case implicates the Plaintiff's rights arising under Federal law.

2) This case arises under Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12111, et seq., which incorporate, through 42 U.S.C. 12117(a) the powers and remedies, and procedures set forth in Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq.

3) The jurisdiction of this Court is invoked pursuant to Section 706 (f) (3) of the Civil Rights Act of 1964, amended by the Civil Rights Act of 1991, codified at 42 U.S.C. § 2000e, et. seq., and pursuant to 42 U.S.C. §1891A; the Civil Rights Act of 1991; Pub L. No. 102-166, 105 Sta. 1071; and 28 U.S.C. §§ 1331, 1337, 1343, 2201 and 2202, conferring original jurisdiction upon this court of any civil action arising under the laws of the United States and for declaratory and injunctive relief under the Declaratory Judgment Act.

4) Plaintiff is currently a resident of the State of Washington.

5) Defendant is a resident of the State of Maryland with facilities in Colorado.

5

6) The amount in controversy exceeds $75,000.

7) Plaintiff also brings under pendent jurisdiction claims arising under Colorado State Law from a common nucleus of operative facts. Pendent jurisdiction of these State law claims is proper under 28 U.S.C. §§ 1331, 1332, and 1337 and the pendent jurisdiction doctrine. F.R.Civ. P. 18(a). <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715 (1966)

8) The unlawful acts of the Defendant were committing within the State of Colorado.

9) Venue properly lies in the District of Colorado pursuant to 28 U.S.C. §1391(b) and §1391(e), and 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices were committed in this judicial district.

10) Richards received a NOTICE OF YOUR RIGHT TO SUE from the EEOC in Charge No. 531-2022-01431

## II. THE PARTIES

11) Lockheed Martin, Inc. (hereafter "LM") d/b/a Lockheed Space is an employer in the State of Colorado who recruited, hired, discriminated against, and fired the Plaintiff.

12) Lockheed Martin d/b/a Lockheed Space is a for-profit company providing manufacturing, design, consulting, and other products and services relating to the aerospace needs of the U.S. Government military and private airline companies.

13) Lockheed Space operated an office and business facility at 12257 S Wadsworth Blvd, Littleton, Colorado 80127, where the Plaintiff was hired, employed, and worked for the Defendant.

14) Lockheed Martin, Inc. is a corporation authorized to do business in the State of Colorado which is doing business in the State of Colorado.

15) LM conducts its activities throughout the United States of America.

16) Daniel Richards is a man and a natural person who at the time of events addressed in the Complaint resided in the State of Colorado.

## III. FACTS COMMON TO ALL COUNTS

17) Daniel Richards is a military veteran who served for 15 years.

18) Richard's leg was injured from and during his service in the U.S. military.

19) As a result of the injuries to his leg in the military, Richard's leg developed what is sometimes called compartment syndrome. This results in fluids building up in internal spaces (compartments) in the legs and its bones.

20) Intensive or extended physical activity causes fluids to build up in Richard's leg faster than the body naturally processes and removes them.

21) The U.S. military has formally and officially recognized Richard's disability as a permanent disability and designated Richards as being 90% disabled.

22) Richards was hired by Lockheed Martin as a technician on or about June 1, 2015.

23) LM terminated Richards' employment by a document titled DISMISSAL AND NOTICE OF RIGHTS on or about March 24, 2021.

24) Richards had committed no defect or insufficiency in his work to justify termination.

25) LM at its facility in Colorado performed assembly and manufacturing of components, devices, and completed products for use in aerospace applications, primarily for the National Aeronautics and Space Administration (NASA) but also for the U.S. military.

26) The Lockheed Space facility in Colorado was primarily focused on space applications and less on military weapons and hardware, although some satellites and space hardware was also sold to the U.S. military.

27) As a result, the Lockheed Space leaders and employees Lockheed Space in Littleton, Colorado were generally more interested in and oriented towards space exploration in their attitudes and less on the military than one might expect in the usual Lockheed Martin facility.

28) Lockheed Space leaders and employees at Lockheed Space in Littleton, Colorado were generally less supportive of military veterans than the general overall reputation of Lockheed Martin as a whole.

29) Within a year of his hiring, Richards was promoted to the position of "manufacturing support team member."

30) While the Lockheed Space facility in Littleton, Colorado engaged (engages) in significant assembly line and manufacturing work, technicians like Richards supported that work with designs, creating standards, drafting guidance documents, training, trouble-shooting, answering questions, and many similar duties.

31) As part of the "manufacturing support team" to which Richards was supported, Richards and other members of that team engaged in a more involved outreach to the manufacturing engineers and manufacturing personnel, including conducting regular training scheduled among assembly and manufacturing staff, meeting with them, etc.

32) After his promotion, Richards discovered that the new job required far more walking and more or less continuous walking from location to location to meet with manufacturing and assembly teams and deliver training at locations all throughout the Lockheed Space campus.

33) There turned out to be far more walking than he had anticipated upon accepting

6

promotion.

34) Richards also discovered that as a result of this substantial increase in daily walking, his injured leg was far more painful and inflamed than he had expected.

35) As a result, Richards was almost constantly in pain, and upon returning home was unable to do much of anything but nurse his injured and painful leg.

36) Richards requested an accommodation under the Americans with Disabilities Act and work place rules to accommodate the continuing injury to his leg and the impact on his health.

37) Richards requested that he be returned to his former job position and decline the promotion so that he could have less trouble with his leg.

38) Lockheed Space refused to provide any accommodation to Richards.

39) His original supervisor at that time, Jeremiah Hayes, said no, we will see after a year about making changes.

40) Reasonable accommodation is any change or adjustment to a job or work environment that permits a qualified applicant or employee with a disability to participate in the job application process, to perform the essential functions of a job, or to enjoy benefits and privileges of employment equal to those enjoyed by employees without disabilities. For example, reasonable accommodation may include:

• providing or modifying equipment or devices,

• job restructuring,

• part-time or modified work schedules,

• reassignment to a vacant position,

• adjusting or modifying examinations, training materials, or policies,

• providing readers and interpreters, and

• making the workplace readily accessible to and usable by people with disabilities.

• Reassignment to a vacant position would be another addition.

41) Increasingly common of late, a scooter or half-scooter that supports one leg could have been explored as a device accommodation had LM been open to discussing solutions.

42) Another accommodation might have been a greater proportion of training sessions where trainees would travel to a meeting room close to Richards instead of him traveling so often to them.

43) Richards continually informed various officials and the human resources department of his need for an accommodation, but got no relief.

44) A later supervisor Eric Grabo also refused any accommodation.

45) Grabo ignored Richards' discussion, as in physically in person face to face, turned and walked away after hearing his questions and statements in person at close range.

46) Grabo was moved over from the quality department.

47) Grabo had a background with a military contractor to the U.S. Navy, but not as a veteran of the Armed Forces.

48) Suprisingly, Richards' then supervisor Eric Grabo and others were hostile to military veterans.

49) Richards kept extensive, detailed, exhaustive, and lengthy notes but here heeds the admonishment to make his Complaint only a short and plain statement of the facts.

50) Eric Grabo told one of Richards' co-workers that he hates military veterans and mentioned to that co-worker that veterans "took the easy way out" by getting a free education as military veterans.

51) On information and belief, Grabo did not realize that the co-worker of Richards he told this to was himself a military veteran.

52) Richards observed that Eric Grabo tried to and often did promote and hire non-veterans who had gotten their educations on their own.

53) However, in Richard's observation these workers lacked the real-world experience of how the products of LM would actually be used and under what conditions by the military, including satellites used by the military.

54) Richards observed that the surprising and unexpected anti-veteran bias within Lockheed Space is undeniable, based on the actions of supervisors.

55) In another instance, a supervisor bragged about getting a fellow coworker sent to the basement for "pointing out issues" and told Mr. Richards, "I know David [Braley] isn't a Vet, but we're going to treat him like one" and then laughed, and "This is why I got him assigned to the basement and out of the way. Keep it up and you will end up down there next."

56) Accordingly, Richards contends that Lockheed's Space's refusal to provide accommodation to his disability was an intentional "constructive discharge."

57) That is, certain supervisors within Lockheed Space created a hostile work environment for military veterans.

58) A non-Veteran coworker of Richards, named Nathan Campbell was promoted to Engineer before he even completed his college degree and was promoted a second time only one (1) year later to a supervisory position.

59) By contrast, Richards has over six (6) years' experience on the job but seemingly because of his Veteran status, he was passed over time and again for promotions and other employment opportunities.

60) Alex Maleski was one of the anti-veteran supervisors that Eric Grabo brought over.

61) Justin Morgan was hired by Eric Grabo with the same anti-veteran hostility.

62) On information and belief, from what Richards and other co-workers observed, military veterans tend to be "by the book" while the company was trying to skirt the rules to lower costs on the manufacturing floor.

63) From Richards' observations and conversations the military veterans would have different attitude of pride in their work for military satellites and missiles and were not merely working a job.

64) On information and belief, on-veterans were more flexible in bending the rules for manufacturing to below the industry standard.

65) The veterans knew too much about the proper way, the proper standards, and the consequences on the battlefield to be easily manipulated into lowering standards.

66) Richards and other veterans he observed would fight back against efforts to cut corners.

67) Richard would have to prove internal documents for manufacturing procedures versus externally available documents to uphold the proper standards.

68) Lockheed Space where Richards was working started hiring engineers who were not fully and properly educated in the necessary disciplines and so the quality dropped – and in Richards' opinion dramatically.

69) Richard's job became in part to train those hires to produce up to required quality while controlling costs.

70) These new hired were paid less.

71) The earlier manufacturing engineers actually had worked the floor, and participated in the manufacturing process.

72) Richards contends that incidents of manufacturing standards being lessened are proven by the many, constant changes made to the manufacturing standards including after NASA performed inspections.

73) Richards sent out 20-30 applications jobs per year, most of them to transfer to other jobs within LM but increasingly to other aerospace companies toward the end.

74) Richards was prevented from moving up in Lockheed since 2018.

75) As result, Richards submitted approximately one hundred (100) applications to local and out-of-state positions within Lockheed in 2020 but he was never once offered an interview or heard any response.

76) Later, Richards discovered that a supervisor (Mr. Maleski) was intentionally blocking his applications by defaming him to hiring managers for these other jobs in an abuse of authority.His then supervisor Grabo told other people in the office, not knowing that Richards had just walked up to his cubicle from behind, that they had ways of blocking people from getting a new job within LM.

77) Richards was being considered for a position in Florida.

78) Richards talked to ethics department and they didn't want to look into it, didn't see anything wrong.

79) Richards checked with HR if he was eligible for a new job within LM.

80) As soon as this incident happened, Richards started getting responses and interviews to new jobs.

81) On information and belief, Grabo and other supervisors not friendly to military veterans blocked Richards from getting other jobs by bad-mouthing him to hiring managers, apparently to induce him to quit by constructive discharge.

82) However, after that his then the boss started to nitpick his resume, falsely.

83) His supervisor asked Richards if he did this or that in his current job as listed on his resume.

84) Richards said yes I do those things.

85) That supervisor then told the hiring manager for the job Richards was working to get that Richards had falsified his resume and should not be hired.

86) Richards resume was truthful and he actually did the tasks that he listed on it.

87) By 2021, Mr. Richards reasonably felt that harassment by his then supervisor (Mr. Morgan) had reason to a level creating an extremely hostile work environment and so he

reported the discriminatory treatment to Lockheed's Ethics and Human Resources departments.

88) In response to these reports, Lockheed Space did nothing to aid Richards and ignored all of his requests for assistance.

89) After Richards left, LM did a large investigation and fired a lot of anti-veteran people except Eric Grabo.

90) On information and belief a copy of that report from the LM investigation will document these concerns.

91) Richards quit because he knew LM was trying to fire him.

92) Richards alleges an aggressive termination and drove him out.

93) Grabo and other LM personnel blackballed Richards from other positions within LM and with other similar companies in the aerospace community.

94) Grabo and other supervisors sabotaged Richards in his work.

95) On one day, for an example, Richards told his supervisor that he was going over to do some training tomorrow afternoon at a specific office.

96) In the morning that supervisor went over and trash-talked Richards to those he was supposed to train, as told to him by those in the office he arrived to train.

97) His supervisors trash-talked him to offices he had to work with and sabotage his projects to make him look bad.

98) Mr. Richards was removed and excluded from supervisor meetings, projects, and email chains whenever one of the associate managers was included.

99) Similarly, Mr. Richards was intentionally kept in the dark whenever defect data and tracking systems were involved.

100) Another example of discriminatory treatment, a hostile work environment, and constructive discharge is the fact that Mr. Richards was asked to submit Weekly Action Reports ("WARs") more often and consistently than other employees so that his manager could keep up with all of his projects.

101) Mr. Richards did comply for a while until he noticed that his work projects would disappear without explanation and those coworkers tasked with working with him would soon after stop communicating with him, "freezing" him out and making his job significantly more difficult.

102) That is, the reports were being used as information to interfere with and sabotage his work.

103) Mitch Sanders – is one of the witnesses to the supervisor talking about how they keep people from moving on, and blocked Richards from finding a new job.

104) Johnny Lee – is another witnesses to supervisor talking about how they keep people from moving on, blocking Richards.

105) Jacob Clinton, Richards protégé, witnessed everything "pretty much."

106) Brian Moyer would testify as a witness.

107) The discriminatory conduct of which Plaintiff complains in this action includes:
   A. Termination of my employment
   B. Failure to promote
   C. Failure to accommodate disability
   D. Unequal terms and conditions of employment
   E. Retaliation
   F. Harassment including as constructive termination.

## COUNT I: VIOLATION OF THE AMERICANS WITH DISABILITIES ACT ILLEGAL UNDER FEDERAL LAW

108) The Plaintiff reasserts the allegations of the preceding and incorporate these by reference as if set forth herein.

109) The foregoing sets forth violations of Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12111, et seq., which incorporate, through 42 U.S.C. 12117(a) the powers and remedies, and procedures set forth in Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq.

## COUNT II: VIOLATION OF THE AMERICANS WITH DISABILITIES ACT ILLEGAL UNDER COLORADO LAW

110) The Plaintiff reasserts the allegations of the preceding and incorporate these by reference as if set forth herein.

111) The foregoing sets forth violations Colorado's version of the Americans with Disabilities Act.

## COUNT III: BREACH OF CONTRACT ILLEGAL UNDER COLORADO LAW

112) The Plaintiff reasserts the allegations of the preceding and incorporate these by

reference as if set forth herein.

113) The foregoing sets forth a case of breach of LM's contract of employment with Richards under Colorado law.

## COUNT IV: BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING ILLEGAL UNDER COLORADO LAW

114) The Plaintiff reasserts the allegations of the preceding and incorporate these by reference as if set forth herein.

115) The foregoing sets forth a case of the existence of a contract which has been breached in violating the implied duty of good faith and fair dealing pursuant to Colorado State law.

## COUNT X: VIOLATION OF NDAA ILLEGAL UNDER FEDERAL LAW

116) The Plaintiff reasserts the allegations of the preceding and incorporate these by reference as if set forth herein.

117) The foregoing sets forth a case of discrimination against military veterans and disabled military veterans.

## DEMAND FOR TRIAL BY JURY

Pursuant to Fed.R.Civ.P. 38, Plaintiff respectfully demands a jury trial on all issues so triable.

## CLAIM FOR DAMAGES FOR VIOLATIONS WITHIN THE ABOVE COUNTS

118) In addition to the facts alleged above, as a direct and proximate result of LM's actions detailed above, and in the foregoing Counts of legal claims and theories, the Plaintiff has lost salary and benefits, and he is presently losing salary and benefits, and will continue to do so, and will suffer future pecuniary losses,

119) In addition, the Plaintiff also demands reinstatement for his unlawful firing, pursuant to **Section 706 (g) (1)** of the Civil Rights Act of 1964 as amended, including back pay for up to two years measured from the date of firing until the time of decision in this case, for a total of $65,000 for two years or **$130,000**, plus lost benefits of insurance and the like.

120) LM's actions were legally malicious within the meaning of legal malice.

121) LM's actions were undertaken with reckless indifference to Federally protected rights.

122) LM's actions were undertaken with reckless indifference to the harm to Mr. Richards's future career and private business.

123) Accordingly, substantial punitive damages are warranted against the Defendant.

**WHEREFORE,** your Plaintiff hereby respectfully demands that this Honorable Court to enter judgment in favor of the Plaintiff against the Defendant, specifically

    A. Back pay, including but not limited to payment since termination, the loss of additional wages during Plaintiff's time of employment casually related to the employer's actions tantamount to stonewalling promotions and additional income earning ability.

    B. Front pay  Income Plaintiff would have earned in the future had the employer not discriminated against the Plaintiff

    C. Compensatory damages, emotional distress, medical expenses, pain and suffering, including loss of free time and pain from worsened condition of his leg.

    D. Consequential damages:  Costs associated with securing employment after Plaintiff's wrongful termination.

    E. Punitive damages to the extent allowed by law.

    F. Attorney's fees

    G. Costs of the litigation.

    H. Such other and further relief as this Court deems just and proper.

Dated: February 22, 2023                      RESPECTFULLY SUBMITTED
                                        DAN RICHARDS

_[signature]_

## CERTIFICATE OF SERVICE

I hereby certify that this document is being filed through the U.S. Postal Service, "Express" overnight delivery, postage prepaid, by the mail box rule on this February 22, 2023, with the Clerk of the Court, and by email and physical mail to:

*[signature]*